J-S35031-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: M.R.S., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: Q.L.W., MOTHER | : : : : : : | |
| | : | No. 827 MDA 2023 |

Appeal from the Decree Entered May 9, 2023
In the Court of Common Pleas of York County Orphans' Court at No(s):
2023-0058

BEFORE:   PANELLA, P.J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                **FILED: NOVEMBER 9, 2023**

Q.L.W. ("Mother") appeals from the May 9, 2023 decree of the orphans'
court terminating her parental rights to M.R.S., born in June 2021 ("Child").
After careful review, we affirm the decree.

Child first came to the attention of the York County Office of Children,
Youth, and Families ("the Agency") on September 6, 2022 when the Agency
received a referral regarding concerning behavior by Mother that placed Child
at risk.  As explained by an Agency caseworker at the May 9, 2023 hearing,

> Specifically, there were allegations that the police had responded
> to a store where it was reported that [Mother] had been
> shoplifting.  Mother had [Child] in her custody at that time and
> had been observed out walking in the rain with [Child].  Police
> attempted to secure shelter for Mother and [C]hild.  However,
> there were not available shelters.  The [A]gency later learned that
> Mother had been staying at the Days Inn and was advised to

---

[*] Retired Senior Judge assigned to the Superior Court.

return there. Mother did not return to the Days Inn[,] and [she] was later located walking the streets with [C]hild. They were taken by ambulance to York Hospital. Mother was involuntarily committed . . . [and Child] was examined and determined to be in good health and not need[ing] hospitalization. While at the hospital, Mother told hospital personnel that she believed her daughter was dead.

N.T., 5/9/23, at 22.

An application for emergency protective custody of Child was filed by the Agency on September 7, 2022. At the time that the application was filed, Child's father, S.S.S. ("Father"), could not be located, although the Agency later discovered that he was residing at York County Prison.[1] Child was placed in kinship care as of the date of the September 7 hearing. On September 9, 2022, the orphans' court issued a shelter care order finding that return of Child to Mother or Father was not in her best interest. A dependency petition was filed by the Agency, and Child was adjudicated dependent on September 15, 2022. While it is not entirely clear from the record whether Child was immediately placed in the care of her maternal grandmother ("Grandmother"), Child has resided with Grandmother for the majority, if not all, of the time since her removal from Mother's care. Grandmother is a pre-adoptive resource for Child.

Status review hearings were held on December 21, 2022, and February 17, 2023. On March 21, 2023, the Agency filed a petition for involuntary

---

[1] The orphans' court noted in its Pa.R.A.P. 1925(a) opinion that Father remained in detention on charges of, *inter alia*, rape by forcible compulsion. Orphans' Court Opinion, 7/10/23, at 7 n.2.

- 2 -

termination of Mother's and Father's parental rights. On May 9, 2023, the orphans' court conducted a status review hearing and then proceeded to a hearing on the termination petition. Agency caseworker and intake manager Patricia Neiderer, Grandmother, and Mother testified at the hearing. Child was represented by legal interests counsel, as well as a separate guardian *ad litem* ("GAL"), in the termination proceedings. *See In re Adoption of K.M.G.*, 240 A.3d 1218, 1235 (Pa. 2020) (holding that appellate courts should engage in *sua sponte* review to determine if orphans' court appointed legal interest counsel to represent children in contested termination proceedings). Additionally at the hearing, Father consented to Child's adoption and the voluntarily relinquishment of his parental rights.[2] Orphans' Court Opinion, 7/10/23, at 7; N.T., 5/9/23, at 7, 16-18; Consent by Parent of Adoptee, 6/12/23.

The orphans' court comprehensively summarized the testimony presented at the May 9, 2023 hearing in its opinion:

At [the] status review hearing on May 9, 2023, Patricia Neiderer, [] testified that Mother was re-hospitalized, again via involuntary commitment, at Massachusetts General Hospital, due to mental health concerns, from February 11[,] 2023 to March 17[,] 2023; however, as of the termination hearing, Mother was living in the home of her [great-]aunt[]. [N.T., 5/9/23,] at 4. Mother reported that she was receiving medication management through Philhaven [], which had not been responsive to releases to obtain records.

_____

[2] Father has not withdrawn his consent, nor has he filed an appeal. Orphans' Court Opinion, 7/10/23, at 7 n.3.

*Id.* Mother was employed at [a hotel] but was hoping to move to [a packaging company] to obtain more regular hours. *Id.* . . .

In spite of Mother's hospital stay at Massachusetts General being involuntary, Mother [has] refused mental health case management. *Id.* at 5. Ms. Neiderer had been unable to confirm Mother's claim that she was continuing her medicine management through Philhaven. *Id.* Questioned by the [orphans' c]ourt, Ms. Neiderer testified that[] Mother came out of involuntary commitment, took her medicine, and refused mental health treatment, which is a pattern that Mother has followed throughout this case. *Id.* at 12.

Mother was not visiting with [C]hild [through the Agency], as visits were discontinued prior to Mother's second involuntary hospitalization. *Id.* at 5. [On] May 1, 2023, Mother requested visits; however, [] despite no contact with Ms. Neiderer from Mother's hospital discharge on March 17, 2023, until May 1, 2023, Mother had no contact with Ms. Neiderer and did not request visits in the interim. *Id.* at 5-6. Mother's last visit with [C]hild was December 8, 2022. *Id.* at 11.

. . . Ms. Neiderer was unaware if Mother had contacted the prior caseworker regarding visits at any prior time. *Id.* at 10. Despite there being a process for Mother to see [C]hild, in which Mother only needed to contact a caseworker to request visitation, there were no records [of such a request], which . . . the caseworker [would have been] responsible to log, [if] such a request [was made]. *Id.* at 35-36. During cross-examination by Mother's counsel, it was established that, during a period of Mother's incarceration, Mother had requested visitation; however, Mother was not undergoing mental health treatment in the prison and the caseworker reported Mother was not in a position to visit. *Id.* at 43.

Ms. Neiderer testified that she was informed by Hugh Smith and Associates, who were performing Mother's parenting capacity assessment, that, as of the hearing, there were yet to be any verbal recommendations. *Id.* at 10-11. The assessment had been performed the week prior on May 4, 2023. *Id.* at 11.

[According to Ms. Neiderer, Child] was doing well in the kinship home of her [Grandmother, who is a pre-adoptive resource for Child]. *Id.* at 7. . . . The [A]gency recommended that [Child] remain in the custody and care of Grandmother [] and that [Child's] parents' rights be terminated. *Id.* . . .

Following a recess, the [orphans' c]ourt convened a termination of parental rights hearing on May 9, 2023. *Id.* at 13. The testimony of the status review hearing was incorporated into the dependency matter and termination of parental rights hearing. *Id.* at 15. Ms. Neiderer was called and [testified that, although] she was not assigned the case until April 21, 2023, [she] managed the previously assigned caseworker and had been supervising the case since September 6, 2022. *Id.* at [20-]21.

[Ms. Neiderer stated that, after Mother's involuntary commitment on September 6, 2022, no] protective services were offered to Mother due to the need for emergency mental health placement. *Id.* at 22-23. Likewise, the [A]gency did not attempt to [implement a] safety plan with Mother prior to placing [C]hild, . . . due to Mother's mental state at the time. *Id.* at 23. At the time, the [A]gency was unsure where Father was; Father was later located at York County Prison. *Id.* On September 6, 2022, the [A]gency sought and was granted emergency protective custody and [Child] remained in placement from September 6, 2022, which, as of the hearing, amounted to some eight months. *Id.* [Child] was adjudicated dependent and remained so and, by the time of the hearing, [Child] had been dependent approximately eight months. *Id.* at 23-24.

Family service plans were created[,] and Mother's goals were to address mental health, cooperate with the [A]gency, and to cooperate with an in-home team. *Id.* at 24. Mother did not cooperate with an in-home team. *Id.* The only treatment that Ms. Neiderer was aware of Mother being in, as of the termination hearing, was Mother's self-reported medication management through Philhaven and Ms. Neiderer was unaware of any [other] mental health treatment being received by Mother. *Id.* at 25. As for her goals, Mother completed a psychiatric [examination] during her second involuntary commitment and completed her parenting capacity evaluation on May 4, 2023 . . . *Id.* Mother had not made any progress in addressing her mental health as she simply kept repeating a pattern of getting back on medication after a period of inpatient hospitalization, doing well for a brief period of time, going off her medication, and needing to be re-hospitalized. *Id.*

Evidencing a long history of mental health concerns, during a scheduled visit on November 1, 2022, Mother forced herself into a[n Agency] van during transport, was dropped off at maternal [G]randmother's house, and then walked back to the daycare and

picked up [Child]. *Id.* at 26[, 40]. Mother then proceeded to York Hospital[, Grandmother's place of employment,] and proclaimed that she was there to pick up Grandmother[]'s body, because she was dead, and that this was why Mother picked up [C]hild from daycare. *Id.* at 40.

By way of further example, on December 7, 2022, Mother sent Grandmother [] nonsensical text messages claiming that Grandmother was being watched by the F.B.I., that Grandmother was torturing [Child], and stating Grandmother was the devil. *Id.* at 26. Police responded and found [Child] to be safe and unharmed. *Id.* Mother's behavior seems only to have grown more erratic from this point on.

On February 3, 2023, *id.* at 41, Mother began sending voice and text messages to the caseworker alleging Grandmother was withholding [C]hild from Mother, which[ led to] the caseworker and [GAL], fearing for [Child's] safety, cancel[ing] upcoming visitations. *Id.* at 26-27. [On February 7,] Mother [] showed up at Grandmother's home and let herself in and, eventually, heeded Grandmother[]'s demands that Mother leave. *Id.* at 27. Thereafter, Grandmother locked up the house, realized her car keys were gone, and suspected Mother of taking her car keys. *Id.* at 27. Mother then showed up at day care and attempted to take [C]hild while alleging Grandmother had no custodial rights[; Mother then] kidnapped [Child from the daycare]. *Id.* Grandmother [] reported the theft of her car keys to police and discovered that she was also missing a set of knives and a credit card. *Id.* Grandmother discovered unauthorized transactions demonstrating that Mother had used the credit card to buy plane tickets from Towson, Maryland to Boston, Massachusetts and for further travel to Germany. *Id.* It was believed that Mother intended to take [Child] to Germany; however, Mother was picked up in Boston and was involuntarily committed to a psychiatric facility. *Id.* . . .

Mother never had safe, stable, and appropriate housing for herself and [Child]. *Id.* at 29. During the pendency of proceedings, Mother claimed; to reside at a home from which there was an eviction notice; to reside between Mother's grandmother's home and Mother's aunt's home, *id.* at 28; to reside in Grandmother's [] home, which, Grandmother [], reportedly vacated; and to reside with [Grandmother's aunt]. *Id.* at 29. As will be addressed chronologically, below, Grandmother [], credibly, clarified some of the details of Mother's various living situations that were initially

described by [Ms.] Neiderer—most glaringly, that Grandmother never vacated her home for Mother.

Since adjudication, Mother never maintained a lawful source of income. *Id.* at 29. Despite a support order entered against her for $213.00 per month, Mother had made no support payments. *Id.* at 29-30. Mother provided no direct financial support to the [A]gency or kinship family. *Id.* at 30. . . .

Mother's last visitation was December 8, 2022. *Id.* This was the result of Mother being incarcerated [from December 16, 2022 to January 27, 2023] and due to Mother being involuntarily committed a second time for mental health hospitalization [from February 11, 2023 to March 17, 2023]. *Id.* [at 4, 30, 44.] At the time of the termination hearing, there was a court directive that Mother was not to have contact with [C]hild due to her continued mental health issues. *Id.* at 30-31. Mother never progressed beyond fully supervised visitation with [Child]. *Id.* at 31.

On October 12, 2022, a referral was made for Mother to have parenting education through Pressley Ridge. *Id.* at 31. On December 12, 2022, Pressley Ridge closed the referral due to being unable to contact Mother who made no response to several texts and calls. *Id.*

Mother also refused contact with [a mental health program] after a referral was made in October of 2022. *Id.*

Ms. Neiderer opined that Mother had not been successful with services and that there were no other services that the [A]gency could have offered to Mother. *Id.* at 32. Mother made no requests for services outside of the alleged pre-termination hearing visitation request. *Id.*

Mother did not attend any of the medical appointments for [C]hild. *Id.* In the six months prior to the termination hearing, Mother had not performed any parental duties beyond attending visitations. *Id.* Mother was in no position to receive physical custody of [C]hild due to Ms. Neiderer's inability to confirm Mother's mental health treatment following recommendations made when Mother was involuntarily hospitalized in Massachusetts. *Id.* at 32-33. [Ms. Neiderer opined that, d]espite having been afforded a reasonable period of time, Mother had not remedied the conditions that caused [Child] to be removed from Mother's care. *Id.* at 33. Mother had not made diligent effort towards resuming her parental responsibilities. *Id.* Ms. Neiderer

testified that, in the opinion of the [A]gency, termination of Mother's parental rights was in [Child's] best interests due to [Child] deserving permanency[. *Id.*] at 33-34. Moreover, "[g]iven Mother's mental health, the likelihood that she'll reasonably be able to achieve the goals and maintain the progress necessary to have [Child] returned and maintained safely in the home is low.["] *Id.* at 34.

An [A]gency representative, Christine Brown, had met with [C]hild at Grandmother[]'s home and made notes regarding the visit. *Id.* at 36.  Ms. Neiderer testified that those notes indicated that [C]hild was safe and happy in Grandmother's home. *Id.*  Ms. Neiderer had no information whether there were any requests by [C]hild to see Mother. *Id.* at 37.  It was reported to Ms. Neiderer that there was a great bond between [Child] and Grandmother []. *Id.* . . .

[With respect to the Agency's assessment of Mother's bond with Child,] Ms. Neiderer[ stated that] Mother's first [supervised] visit [with Child on October 5, 2022 went] well, with Mother interacting appropriately with [C]hild, but Mother end[ed] the visit early due to another appointment. *Id.* at 38[, 40].  [During the second of three visits Mother had with Child on November 1, 2022,] Mother attempted to force her way into the [Agency] van[ as described above. *Id.* at 38, 40.  At the] last visit on December 8, 2022, . . . Mother was not interactive with [C]hild, never took off Mother's or [C]hild's jacket, Mother sat in a chair with her head propped up and staring at [Child] while speaking very little and in a low voice and not making any sense. *Id.* at 39.  The caseworker provided Mother with coloring books and crayons and Mother then hugged [Child] and sat on the floor while [Child] walked around the room. *Id.*  Mother mumbled again but made little sense. *Id.*  Given a ten[-]minute warning prior to the end of visitation, Mother did not begin cleaning up and, instead, when time was up, attempted to leave, became argumentative about cleaning up, acted as though she was going to clean up, and, finally, Mother stormed out of the visitation area while holding [Child] and proclaiming that she had to work and would be unable to clean up. *Id.* at 39-40.

Grandmother [] was called and she testified that [Child] was doing well in her home and was getting along well with the other children in the home, with the youngest being five years older. *Id.* at 45-46.  Grandmother testified that Mother did not attempt in-person contact with [C]hild, but that Mother would attempt, approximately twice a day, to FaceTime with [C]hild. *Id.* at 46.

Mother provided *de minimis* financial support to Grandmother for [C]hild [in amounts in the range of $5, $10, and $20]. **Id.** at 47[, 51-52, 64].

Asked what she would prefer in terms of contact with either parent post adoption, Grandmother credibly responded that she was unsure, but offered that she felt it was important for [Child] to know her parents. **Id.** at 47. Grandmother had made attempts to facilitate custody periods for paternal grandmother but had not succeeded as of the hearing due to paternal grandmother's husband's health concerns. **Id.**

Grandmother [] felt that, due to her familiarity with Mother's mental states, she would be able to protect [Child] when Mother is not mentally well. **Id.** at 47-48. Grandmother, describing how FaceTimes between Mother and [C]hild would go, felt that [Child] has grown accustomed to being with Grandmother and that she's excited when Mother calls. **Id.** at 48-49. [However, Grandmother stated that Child] does not exhibit signs of yearning for her by, say, grabbing the phone and saying "mom." **Id.** at 49.

On cross-examination, Grandmother [] indicated that she felt as though Mother's mental state has been better since she left hospitalization. **Id.** at 50. Grandmother related how Mother desired to raise her own daughter, even to the exclusion of Grandmother's involvement, but that Mother would prefer Grandmother [] to anyone else to raise [Child] if Mother could not. **Id.** at 51. . . .

Grandmother testified that during a period when Mother was out on bail, Mother had no place to live and Grandmother set [M]other up in hotels. **Id.** at 54-55. Grandmother [] indicated Mother could not live with Mother's grandmother or Grandmother[]'s aunt and stated that Mother never lived with Grandmother [] in this period, nor did Grandmother [] vacate her residence to make way for Mother. **Id.** at 55. Mother lived with Grandmother[]'s aunt upon her return from [her involuntary commitment in] Boston. **Id.** at 56. Grandmother testified that she feels Mother is at an appropriate point right now to have visits with [Child] and testified that she would call the police the moment her daughter was not fine to be with [C]hild. **Id.** at 57. . . .

Th[e orphans' c]ourt questioned Grandmother [] and Grandmother clarified that she would not agree to anything less than fully supervised visitation for Mother with supervision every minute of that visitation. **Id.** at 58. Grandmother, queried about

her battles with Mother's psychosis, testified that she would be more at ease if Mother would acknowledge and go to the doctors and therapy, but Grandmother stated that she could not make Mother do those things. *Id.* at 58-59. Grandmother detailed the [] history of arguments [between Mother and Grandmother,] Mother's hopes of returning to school and cleaning her life up[,] and the cycle of breakdowns that is preventing Mother's recovery. *Id.* at 59-60. This led Grandmother to acknowledge the following [] regarding Mother's limitations:

> [M]y grace with my daughter is limited at this point. I mean, I love her, like I'm always going to try to help her, but I want her to understand how serious - - like, certain things you just can't do. You can't do what everybody else is doing, and so much of your life has been like kind of taken away and kind of robbed, unfortunately. But, you know, from this point, like, you have the support, you have people here, so make the right choices.

*Id.* at 60.

Grandmother [] acknowledged that in the month prior to the termination hearing, Grandmother and Mother had a difference of opinion, during a doctor's appointment, about Mother's mental health treatment. *Id.* at 60-61. [At that appointment], Mother was refusing ongoing mental health treatment, as she has in the past. *Id.* at 61. The most treatment Mother was willing to engage in was taking medications. *Id.* Mother was FaceTiming with Grandmother [] to make sure that Mother took her medications; though, this [practice] had lapsed in the weeks leading up to the termination hearing. *Id.*

When Mother returned from Boston, it was Grandmother who orchestrated Mother living with Grandmother's aunt. *Id.* at 62. Mother did not make that arrangement. *Id.* Mother's residences during the dependency action were hotels paid for by Grandmother, hospitals for involuntary commitment, jail, and other residences at times when Mother was not under Grandmother[]'s care. *Id.* at 62-63. [] Grandmother agreed that she provided transportation for Mother, via Grandmother driving her or providing Uber, Grandmother paid for Mother's hotels, Grandmother provided Mother money, and Grandmother simply met Mother's monetary needs. *Id.* at 63. When [M]other provided money to Grandmother, it was small increments [that were] vastly outweighed by what Grandmother provided to

Mother. *Id.* at 64. [] Grandmother admitted that, though Mother was doing better at the time of the hearing, she had been in a similarly improved state on multiple occasions in the past before relapsing into psychosis. *Id.* at 64-65. Grandmother [] reaffirmed her commitment to [Child] knowing her parents, *id.* at 65, and Grandmother[]'s ability to maintain at least a minimal relationship with each parent, that would ensure [Child's] safe contact with each parent, to facilitate continued interaction between [C]hild and her biological parents. *Id.* at 65-66. With the caveat that Grandmother [] seeks to maintain the actual identities and relationships of the various parties, in the opinion of [Child's] legal counsel [], [Child] looks to Grandmother as a mother-figure who she would go to for care and support. *Id.* at 68-69.

Mother, implying there was but one period of mental health concern, testified that, prior to her "psychosis outbreak," she was a great mother. *Id.* at 70. Asked what treatment, in the relevant time period, Mother had sought for her psychosis issues, Mother responded that psychosis does not require counseling and only requires medication. *Id.* at 71. Mother testified to how her postpartum depression had been medicated with an anxiety medication, but she still ended up involuntarily committed for approximately three weeks. *Id.* at 72. Mother testified to not trusting being medicated during a stint in jail and how she decided that she would seek treatment upon her release. *Id.* at 73. Mother testified that she and [Grandmother] had actually argued over the form of Mother's medication—Mother claimed to have suffered paralysis of the left side of her body and a stiff neck from injections and, so, Mother preferred to ingest her medication. *Id.* at 73-74.

Mother asserted that she was fully capable of taking care of her daughter and that[, if Child was returned to Mother, the two] would be staying with [Mother's great-]aunt until the end of summer, which was her aunt's stipulated point for Mother to move out of [the] home. *Id.* at 75. . . .

Mother testified to desiring to resume visits with [Child]. *Id.* at 76. Mother stated that she did not like going through the [A]gency for supervised visits and that she would rather do visits through Grandmother []. *Id.* at 76-77. . . .

Orphans' Court Opinion, 7/10/23, at 5-18 (record citation reformatted; some emphasis omitted).

At the conclusion of the hearing, the orphans' court announced its decision to grant the Agency's petition to terminate Mother's parental rights to Child and stated its findings and reasoning on the record. N.T., 5/9/23, at 80-87. The orphans' court issued a decree on the same day terminating Mother's parental rights. Final Decree, 5/9/23. Mother filed a timely notice of appeal and concurrently filed a concise statement of errors complained of on appeal, as required by Pa.R.A.P. 1925(a)(2)(i). On July 10, 2023, the orphans' court filed an opinion pursuant to Pa.R.A.P. 1925(a), addressing Mother's appellate claims.

Mother presents the following issues for our review:

I. Whether the orphan[s'] court erred as a matter of law and/or abused its discretion in terminating the parental rights of Mother pursuant to 23 [Pa].C.S. [§] 2511(a)(1) as the evidence did not support by clear and convincing evidence that Mother had evidenced a settled purpose of relinquishing parental claim to [] Child or has refused or failed to perform parental duties?

II. [Whether] the orphan[s'] court erred as a matter of law and/or abused its discretion in terminating the parental rights of Mother pursuant to 23 Pa.[C.S. §] 2511(a)(2) when the evidence did not support by clear and convincing evidence that Child was without parental care or control or that the conditions which led to the initial placement would not or could not be remedied by Mother?

III. Whether the orphan[s'] court erred as a matter of law and/or abused its discretion in terminating the parental rights of Mother pursuant to 23 Pa.[C.S. §] 2511(a)(5) in finding that (1) condition which led to removal or placement of the Child continued to exist; (2) and termination would best serve the needs and welfare of the Child there was not clear and convincing evidence that Mother

- 12 -

could not or would not remedy the conditions which led to the initial removal?

[IV]. Whether the orphan[s'] court should have given Mother additional time to address her significant mental health issues and Mother believes that she was making progress towards alleviating the concerns regarding her mental health issues?

[V]. Whether the orphan[s'] court erred as a matter of law and/or abused its discretion in terminating the parental rights of Mother pursuant to 23 Pa.[C.S. §] 2511(b) when the best interest of the Child would not be served by termination?

Mother's Brief at 6-7 (trial court disposition, suggested answers, and unnecessary capitalization omitted; reordered for ease of disposition).

In addressing Mother's challenge to the termination of her parental rights, we apply the following precepts:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In the Interest of J.R.R.*, 229 A.3d 8, 11 (Pa. Super. 2020) (quoting *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013)).

The burden is on the petitioner in the lower court to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In the Interest of L.W.*, 267 A.3d 517, 522 (Pa. Super. 2021). The clear and convincing evidence standard is defined as

- 13 -

"testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act. "Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination[.]" *In re Adoption of C.M.*, 255 A.3d 343, 359 (Pa. 2021); *see* 23 Pa.C.S. § 2511(a)(1)-(11). If the trial court determines the petitioner established grounds for termination under Section 2511(a) by clear and convincing evidence, the court then must proceed to assess the petition under subsection (b), which focuses on the child's needs and welfare. *T.S.M.*, 71 A.3d at 267.

Here, the trial court terminated Mother's parental rights pursuant to Sections 2511(a)(1), (2), and (5), and subsection (b). However, this Court may affirm the court's decision to terminate if we agree with its determination concerning any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We focus our analysis on Section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> \*          \*          \*
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for

- 14 -

his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*          \*          \*

**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . .

23 Pa.C.S. § 2511(a)(2), (b).

Under Section 2511(a)(2), "the moving party must prove by clear and convincing evidence that there is (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of L.A.K.*, 265 A.3d 580, 600 (Pa. 2021). The grounds for termination under Section 2511(a)(2) are not limited to affirmative misconduct but also include refusal and parental incapacity that cannot be remedied. *In re K.M.W.*, 238 A.3d 465, 474 (Pa. Super. 2020) (*en banc*). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021); *see also In re Adoption of K.M.G.*, 219 A.3d 662, 672 (Pa. Super. 2019) (*en banc*), *affirmed*, 240 A.3d 1218 (Pa. 2020) (noting that a parent has an "affirmative duty" to work towards the return of his children, which requires, at a minimum, that he

"cooperate with the [local agency] and complete the rehabilitative services necessary so that the parent can perform his parental duties and responsibilities"). "[W]hen a parent has demonstrated a continued inability to conduct his life . . . in a fashion that would provide a safe environment for a child, whether that child is living with the parent or not, and the behavior of the parent is irremediable as supported by clear and competent evidence, the termination of parental rights is justified." **In re Z.P.**, 994 A.2d 1108, 1118 (Pa. Super. 2010) (citation omitted).

Mother challenges the orphans' court's finding as to the third element under Section 2511(a)(2) that the causes of Mother's repeated and continued incapacity, abuse, neglect, or refusal—specifically, her mental health issues—could not or would not be remedied.[3] **See L.A.K.**, 265 A.3d at 600. Mother contends that, "[w]hile there was a significant period of time [when she] was not receiving treatment," she "began the road to recovery with her inpatient treatment in Boston and [has] continued to maintain her mental health upon her discharge" and return to Pennsylvania. Mother's Brief at 25. She cites as support for her positive mental state the testimony that Grandmother permitted Mother daily or twice daily FaceTime contact with Child. Mother

---

[3] Mother's first three appellate issues relate to the orphans' court's finding that termination was appropriate under Section 2511(a)(1), (2), and (5). As we may affirm the orphans' court determination under any one subsection of Section 2511(a) and we conduct our analysis only as to subsection (a)(2), we address Mother's corresponding second appellate issue related to this basis for termination, and we do not address Mother's first and third issues pertaining to subsections (a)(1) and (5).

additionally stresses that there was "no indication in the testimony at the time of the [termination] hearing that [her] mental health was decompensating." *Id.*

Upon a thorough review of the record, we conclude that the orphans' court did not abuse its discretion in finding that Mother cannot or will not remedy the causes of the incapacity, abuse, neglect, or refusal that led to Child's removal. The orphans' court persuasively explained the rationale for its decision that termination was appropriate under Section 2511(a)(2) of the Adoption Act at the conclusion of the May 9, 2023 hearing and in its July 10, 2023 Rule 1925(a) opinion. At the May 9, 2023 hearing, the orphans' court noted Mother's "history of psychosis that predates the dependency action," which follows the "pattern of periods of lucidity and doing well, combined with a refusal to engage in mental health treatment, during which time Mother takes her medications for [a] period of time until she determines, in her own mind, the medications are no longer needed." N.T., 5/9/23, at 82. Mother then stops taking the medication and plunges into "various depths of psychosis" in a cycle that "repeats and repeats and repeats." *Id.* at 82-83. The lower court observed that Mother "still has not learned" that "the medication alone has never been enough" and that she requires "ongoing mental health treatment so that she can continue to understand the need to take the medication and so that she can also talk about the various problems and travails and triggers that she encounters in life." *Id.* at 82.

The orphans' court then discussed Mother's inability to remedy the conditions that led to Child's removal. Notwithstanding Mother's current "period of lucidity," the court explained that Mother has "refuse[d] to fully address her mental health conditions," citing the "multiple relapses" over the course of the case with the most glaring example being the abduction of Child and attempt to flee the country to Germany. *Id.* at 83-84. The court further found that Mother "clearly has not met any of her initial goals" established by the Agency as she had not demonstrated "stability in housing" where her current living situation was temporary and entirely arranged by Grandmother and Mother has no "stability in employment" when she has made no payments towards her monthly support obligation and remains dependent on Grandmother for rides and financial support. *Id.* The court added that Mother's visitation with Child—which totaled only three visits—over the course of eight months was "woefully inadequate." *Id.* at 84. The orphans' court concluded at the hearing by stating that "[i]n summary, it's just an overwhelming case in support of termination of parental rights as to [M]other." *Id.*

In its opinion, the orphans' court provided additional support for its finding that Mother has refused to remedy the conditions that led to Child's removal and placement. The court noted that, during the eight-month period of dependency prior to the termination hearing, Mother "demonstrated a continuation of her pattern of mental health cycling between shaky stability and psychosis." Orphans' Court Opinion, 7/10/23, at 28. Mother evidenced

"an intransigent belief that her psychosis can be managed with medicine alone," which position she professed at the termination hearing and which was further confirmed by Grandmother's testimony about recent arguments that she had with her daughter about getting additional help. *Id.* at 20, 25-28. The court discussed various instances that demonstrated Mother's medicine-only treatment was not working: the kidnapping of Child and attempt to abscond to Germany via Boston leading to an involuntary commitment, text messages Mother sent to Grandmother that required police intervention to determine that Child was safe, Mother's incarceration, Mother's attempt to enter a van and abduct Child at one scheduled visit, and her "strange behavior" at another of her three visits. *Id.* at 23-26.

Moreover, the orphans' court discussed in detail Mother's failure to fulfill any of the other goals that were established by the Agency. Mother attended only three supervised visits following Child's removal; while the first of the three visits reportedly went well, Mother still left early for "another appointment" with no explanation for what that appointment was. *Id.* at 22, 24. The remaining two visits did not proceed well, the visits were paused at the urging of the GAL due to safety concerns, and, notwithstanding her purportedly improved mental state, Mother did not request visits after her return from the Massachusetts involuntary commitment until one week before the termination hearing. *Id.* at 23-24. Mother also did not cooperate with the Agency in-home team, and she failed to engage in the mandated parenting education program, with the provider ultimately closing out Mother's

enrollment based upon her lack of participation. *Id.* at 21-22. Furthermore, Mother did not attend any of Child's medical appointments, and she did not provide meaningful financial contribution for Child's care despite being under a court order to pay support. *Id.* at 21-22, 24, 28.

The orphans' court's findings and conclusions with respect to Section 2511(a)(2) find ample support in the testimony presented by the Agency at the termination hearing, as described *supra*. We note that the orphans' court found Grandmother to be a credible witness, relying on her testimony as to such issues as Mother's cyclical mental health history, Grandmother's urgings to Mother to seek additional mental health treatment aside from medication, Grandmother's discussion of the various forms of assistance she continues to provide her daughter, and Grandmother's insistence that she would not allow Mother to have a moment of unsupervised time with Child even in her current sound mental state. *Id.* at 10-11, 14-17, 22, 25, 28. Based on the orphans' court's well-supported findings, we see no error in the court's conclusion that Mother "has demonstrated a continued inability to conduct [her] life . . . in a fashion that would provide a safe environment for" Child and, as shown by the fact that Mother has made no progress to achieving the Agency's goals for reunification, the conditions that led to Child's removal are "irremediable." *Z.P.*, 994 A.2d at 1118 (citation omitted). Therefore, we discern no basis to disturb the orphans' court's determination that termination was appropriate under Section 2511(a)(2).

- 20 -

In her next issue, Mother argues that the orphans' court "should have permitted her additional time to deal with her mental health issues and to be able to properly parent" Child beyond the eight-month period between Child's adjudication of dependency in September 2022 and the termination decree in May 2023. Mother's Brief at 32. While Mother recognizes that the Adoption Act permits termination of parental rights in shorter time frames, she draws our attention to the Juvenile Act which requires a court to consider at a permanency review hearing whether the agency has filed a termination petition when a "child has been in placement for at least 15 of the last 22 months." 42 Pa.C.S. § 6351(f)(9). Mother asserts that termination would only be appropriate in the comparatively short period at issue here if the parent "was making little to no progress towards reunification." Mother's Brief at 31. Mother maintains that, in her case, termination was improper because she has shown "progress" in maintaining her mental health since her last involuntary commitment and Grandmother appeared at the hearing to be "supportive of [M]other's efforts [] to deal with her mental health issues and be a parent for" Child. *Id.* at 31-32.

Initially, we find Mother's citation to the Juvenile Act to be inapt. Our Supreme Court has explained that the Act's required inquiry at a permanency review hearing as to whether a termination petition has been filed when a child has been dependent for 15 out of the prior 22 months was put in place to combat the phenomenon of "foster care drift" when children linger in the foster system for years and ensure that a dependent child achieves

permanency within two years. *See* 42 Pa.C.S. § 6351(f)(9); *In the Interest of K.T.*, 296 A.3d 1085, 1108 & n.19 (Pa. 2023) (discussion of enactment of 42 Pa.C.S. § 6351(f)(9) in accordance with federal Adoption and Safe Families Act of 1997); *T.S.M.*, 71 A.3d at 269 (same). Thus, the required inquiry under the Juvenile Act was intended to establish an **upper limit** on when permanency for a dependent child should be attained rather than a **minimum** period before a termination petition may be filed or considered. Mother cites to no provision that would bar termination of parental rights when only eight months have lapsed from the time the Child is adjudicated dependent to when the termination decree is issued. To the contrary, as Mother recognizes, the Adoption Act specifically envisions that termination may be based upon as little as six months of a parent's conduct. *See* 23 Pa.C.S. § 2511(a)(1), (5) (providing for termination based upon parental conduct of "at least six months"). Moreover, our caselaw makes clear that time is of the essence for a parent to remedy the conditions that led to the removal of her child:

> [A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.

*In the Matter of M.P.*, 204 A.3d 976, 983 (Pa. Super. 2019) (citation omitted); *see also K.M.G.*, 219 A.3d at 672-73 (the Adoption Act "does not provide a parent with an unlimited period time to overcome the incapacity

that led to the adjudication of the child" and "a parent must make a diligent effort towards overcoming [her] incapacity").

The orphans' court addressed as follows Mother's argument that termination was improper only eight months after Child's removal:

> Additional time would not have been sufficient for Mother to ameliorate the [c]ourt's concerns. Mother's extraordinarily supportive and credible mother, Grandmother [], testified that Mother had achieved similar states of improvement on **multiple** occasions in the past, only to, repeatedly, relapse into psychosis. Even with Grandmother['s] immense love and provision of bottomless support for Mother, coupled with the full resources of York County, which testimony established had been exhausted vis-à-vis Mother, over an, approximately, eight-month span, Mother demonstrated repetition of her cycle between greatly supported functioning/wellness and psychosis. . .
>
> . . . Considering Mother's pattern of mental health relapses and Mother's testimonial demonstration of intransigence towards treatment, additional time would not have alleviated [the c]ourt's concerns and would only have deprived [Child] of the stability, love, comfort, and security that she will receive from Grandmother [] who will be unfettered from the capricious whims of Mother's lamentable mental instability.

Orphans' Court Opinion, 7/10/23, at 31-32 (emphasis in original).

We find no abuse of discretion in the orphans' court's analysis. While Mother claims she made substantial "progress" towards her goal of reunification with Child, Mother's Brief at 32, the orphans' court found that Mother made virtually no progress towards the goal of reunification by the date of the termination hearing. As discussed *supra*, Mother did not avail herself of any of the services offered by the Agency, she did not provide financial support for Child, she did not obtain suitable housing, and she only

attended three supervised visits with Child, with further visitation halted due to Mother's concerning behavior. Moreover, the improvement in Mother's mental condition at the time of the termination hearing was, in the orphans' court's estimation, illusory as Mother steadfastly refused to engage in any mental health treatment beyond medication and thus, she remained subject to the same cycle of wellness and psychosis that had continuously plagued her. The orphans' court's findings are supported by clear and convincing evidence. This issue therefore merits no relief.

We next turn to the orphans' court's determination under Section 2511(b) of the Adoption Act, which focuses on "the developmental, physical and emotional needs and welfare of the child" as opposed to the conduct of the parent under subsection (a). 23 Pa.C.S. § 2511(b); *In re C.B.*, 230 A.3d 341, 349 (Pa. Super. 2020). Mother argues that termination of her parental rights does not serve the best interests of Child where there continues to exist a bond between the two. Mother maintains that severing that bond would deprive Child of an existing beneficial relationship. Mother highlights before this Court Grandmother's testimony that Child knows who Mother is, gets excited when Mother FaceTimes with her, and will hug and kiss the phone while speaking to Mother. N.T., 5/9/23, at 48-49.

Under Section 2511(b), a child's particular developmental, physical, and emotional needs must be assessed on a case-by-case basis with a consideration of each child's specific needs. *K.T.*, 296 A.3d at 1105-06; *see also L.A.K.*, 265 A.3d at 593. "The emotional needs and welfare of the child

have been properly interpreted to include intangibles such as love, comfort, security, and stability." ***T.S.M.***, 71 A.3d at 267 (citation and quotation marks omitted); ***see also K.T.***, 296 A.3d at 1106. Accordingly, there is no "exhaustive list" of factors that must be considered in this context. ***K.T.***, 296 A.3d at 1113 n.28.

The Section 2511(b) analysis requires consideration of "the emotional bonds between the parent and child," with the threshold for the bond inquiry being whether termination will sever a "necessary and beneficial relationship," such that the child could suffer "extreme emotional consequences" or "significant, irreparable harm." ***K.T.***, 296 A.3d at 1109-10 (citation omitted); ***T.S.M.***, 71 A.3d at 267. However, consideration of "the parental bond is but one part of the overall subsection (b) analysis." ***K.T.***, 296 A.3d at 1113; ***see also In re N.A.M.***, 33 A.3d 95, 103 (Pa. Super. 2011). A court must also consider, as appropriate, the child's need for permanency and length of time in foster care; the child's placement in a pre-adoptive home and whether there is a bond with the foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs. ***K.T.***, 296 A.3d at 1113.

The orphans' court addressed Section 2511(b) at the conclusion of the May 9, 2023 hearing:

> What's clear to the [c]ourt is [Child]'s bond with Mother has actually improved through the stability, love, care, and nurturing provided by [] Grandmother. I think it's clear that [] Grandmother provides all of the daily supports, including but not limited to financial, love, emotional, all of the supports that a parent would provide are one thousand percent provided solely through [] Grandmother.

I do also find that [Child] is fully bonded with [] Grandmother. She's an integral part of [] Grandmother's family, with the youngest child [living in Grandmother's home] being a mere five years older than [Child]. So [Child] has . . . excellent role models in the older children, and a child that is very close in age, so I can't think of a better adoptive resource than [] Grandmother.

Also, to her credit, [] Grandmother has from day one indicated a desire to identify Mother and Father as Mother and Father and a willingness to supervise and maintain those maternal and paternal bonds, provided it is safe for [C]hild physically, mentally, and emotionally in [] Grandmother's sole discretion. To her credit, [] Grandmother has continued to do that despite the waves of repetitive failure of Mother during the dependency action. It's like crashing wave after crashing wave after crashing wave of Mother's failures, and yet, through it all, the one rock that the waves cannot break is [] Grandmother. [] Grandmother's desire reaches even to Father's mother. So, once again, the [c]ourt cannot think of a better adoptive resource, a more excellent adoptive resource, than [] Grandmother.

Now the bond as to Mother has been nurtured by [] Grandmother. So Mother's bond with her own [C]hild has been nurtured and furthered by [] Grandmother to the point that through [] Grandmother there are successful FaceTime phone calls. However, calling your daughter and caring for your daughter are two totally different things. They are worlds apart. So to the extent that there is a bond between Mother and [Child], it was, number one, created and nurtured by [] Grandmother, the adoptive resource; and, number two, it's toxic as between Mother and [Child], because [Child] simply has no idea when Mother is going to next go off the rails.

N.T., 5/9/23, at 84-86. In its later opinion, the orphans' court noted that, although Child was excited when Mother FaceTimes with her, it does not appear that Child "yearns for [] Mother by grabbing for the phone or saying 'mom'" and that the testimony revealed that Mother was at times "stilted and strange" during supervised visits with Child. Orphans' Court Opinion, 7/10/23, at 30. The court further expressed that it was "greatly concerned" with

Mother's "macabre ideations" during her psychotic breaks—for example, Mother going to Grandmother's place of work, a hospital, and telling everyone that she was there to pick up Grandmother's dead body and Mother's attempted flight to Germany with Child—and how that affected Child's needs and welfare.  *Id.* at 29 (emphasis omitted).

The orphans' court did not abuse its discretion in finding that Child's developmental, physical, and emotional needs and welfare would be best served through termination of Mother's parental rights.  The orphans' court recognized that Mother has an emotional bond with Child and that Child benefits from the FaceTime calls with Mother, yet the court determined that the Mother-Child bond was not a "necessary and beneficial relationship" and that "the trauma caused by breaking [the] bond is outweighed by the benefit of moving [C]hild toward a permanent home" with Grandmother.  *K.T.*, 296 A.3d at 1109; *T.S.M.*, 71 A.3d at 253.  Furthermore, the court appropriately considered Child's strong bond with Grandmother, the fact that Grandmother was a pre-adoptive resource for Child, the suitability of Grandmother's home, and the stability, love, and support provided by Grandmother, which met Child's development, physical, and emotional needs.  *K.T.*, 296 A.3d at 1113.  As with the orphans' court's other findings discussed above, the conclusion that termination is proper under Section 2511(b) is supported by clear and convincing evidence.

Accordingly, as we find that Mother is not entitled to relief on any of her challenges to the orphans' court's May 9, 2023 decree terminating her parental rights to Child, we affirm that decision.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/09/2023